Okay. Thank you, Your Honor. Good morning, Your Honors. John Burton for the plaintiff. I would, I don't have a lot to say at this point, and so I'd like to reserve as much of my time as possible, perhaps five minutes or more depending on the panel's questions. For us, these facts can be a little convoluted and kind of strange, but at bottom, we contend that the, all the claims, all the 1983 claims and the supplemental state claims turn on one fundamental argument. That there was no, this particular warrant was so lacking in indicia of probable cause as to Alan Shay that official belief in its validity was unreasonable. And that means that really there's not an iota of probable cause for Alan Shay in this warrant. So all of the arguments and all of the rulings of the district court really turn on a disagreement with our analysis that there's absolutely no indicia of probable cause and that no reasonably competent police officer would have submitted this warrant for review and signature. So, so can I just tell you, sorry, I was trying to find the police report, because it's really the information that provides probable cause is just, it's in those police reports that you all gave us, right? 31 pages of police reports, almost all of which deal with the other suspect, Eddie Turner, who did commit a crime. Okay. So let's, let's just, let me lay out a couple of propositions and then tell me where I go wrong. You'll concede that there was probable cause certainly to believe that Turner is the other gentleman's name? Absolutely. Yeah. He was convicted. He's in state prison. And the only way your client could potentially in any way be exposed to some criminal liability here is if he in some way aided and abetted the other gentleman, right? Well, that actually was not the charge in the warrant. The charge in the warrant was that he participated in it, but certainly aiding and abetting. Right. He's not the principal actor in the scheme. He's, he's helping this friend of his potentially defraud the bank. So we have the faxing of the, some of the fraudulent documentation to your client's office, and then it's faxed from your client's office to the bank, I guess, right? And I think everyone... To the escrow. I'm sorry. Okay. Yeah. Whatever. But it's sort of coming through. And I think everyone would agree if that's all there was, that's not enough to support probable cause. I agree with that. But, so then the whole thing comes down to the money, right? And, and that's where I just, I look at the, it's probably, I think it's kind of the last page actually in that little packet. And it's where your client is interviewed by the detective and comes up frankly with a suspicious sounding story, right? First it's, I don't remember anything about, you know, a pretty sizable amount of money. I don't know how wealthy your client is, but you know, other than someone who's a billionaire, $30,000, you know, being, or close to that, being withdrawn from your, is it a home equity line of credit? Is that what it was? Yes. I mean, that's a significant amount of money for most people. So let's just assume that your client is, is wealthy, but of, you know, modest wealth, not, not a billionaire. He says, I never knew anything about that money. I certainly don't recall going into the bank to get that money. It was a money order, right? That he purchased. It was a cashier's check. Cashier's check. I have no recollection of that. And then perhaps he was invited to speculate, but he comes up with a pretty crazy story that doesn't make a lot of sense. Then the detective goes and interviews the bank person who says, oh no, I will tell you for sure that that gentleman came in and he did purchase that check in this other person's name. So at that point, it just seems to me your, your client, I don't know why he would be trying to cover up his involvement in the sense of providing the money, but there's probable cause to think that there's something weird going on here. And so that's where I, I like, why would an officer not have some basis for thinking that, yeah, if a, if a DA, a deputy DA and a magistrate judge signs off on this as being adequate, who am I to second guess that? So that's where I'm at. Help me, help me now. Okay. And if, if I could get through sort of the lengthy explanation. The short answer is that the loan and the cashier's check had absolutely nothing to do with the crime that was alleged because the fraudulent document that led to the loan, which had already been approved, had already been submitted to Countrywide. But that's, that's an innocent explanation. In other words, that may be ultimately what turned out to be the case, but at the moment in which the warrant is issued, the facts don't lead you in that direction. So would you have a totality of circumstances? And so I think an innocent explanation doesn't wash in this case. No, that, that, your honor, that wasn't an innocent explanation. It was, it was the, the, the, it was that the check had nothing to do with the fraud, with the crime. The crime here, I think it's very important. No, no, but his point is, you know, that separation was not known at the time. Well, it was known. What you're talking about came out later. That's incorrect. It was known at the time what the crime that ultimately Deputy Derry was investigating, and he changed crimes sort of midway through, but I can address that in a moment. The crime was that Mr. Turner submitted false income and asset information with his loan application. The loan was approved. At the time the refinancing was closed, Mr. Turner was asked to provide $30,000 in a bridge payment. That was provided by Mr. Shea from his HELOC, but the fraud had already taken place, which was the loan had already been approved based on the fraudulent documents that were the crime in this case. Mr. Shea had nothing to do with that. Countrywide stated very clearly through Mr. Gleason that the source of the funds had nothing to do with this loan, that Countrywide was not interested in the source of the funds. That's the record, and that's what Deputy Derry knew at the time. Okay, but if I could explain why this sort of strange circumstance. Yeah, somebody took $30,000 out of an account, and why didn't you know? Number one, while Mr. Shea is certainly not a billionaire, he was making regular transactions, $20,000, $30,000, $40,000 at that period of time. He was an active real estate broker in Southern California. He was flipping properties. He was working with investors. It was a very, very active time. The bank statements that Deputy Derry obtained showed similar transactions every couple weeks. This particular loan was paid back, and it was paid back 45 days later with interest. When he was asked about this document, it was six years later. And the context in which he was asked about this is critical for understanding how this mistake by Mr. Shea, who should have said, yeah, that was from my HELOC account. Mr. Turner asked for a loan. It was secured by other real estate transactions, so I gave it to him, and it was paid back. Had he said that, it would have, you know, obviously eliminated a lot of misunderstandings. And in fact, had Deputy Derry taken the time and come back to Mr. Shea and said, look, I went to the bank, and you did purchase this. This wasn't purchased with someone else. Can you explain it? He could have pulled his file from the Crestview property that he and Mr. Turner were investing in together and were flipping at the time, and said, oh, I see what happened now. That was a loan that was made in connection with transactions back and forth that Mr. Turner and I were making on a separate deal at the same time, because that's actually what happened. What happened here, and this is what I alluded to earlier in my argument, is how this interview with Deputy Derry took place and what the crime was that was under investigation. In 2012 or thereabout, Eddie Turner contacted Mr. Shea and said, somebody put a refinance transaction on my property in 2007. I didn't do it. They must have stolen my identity. This mortgage and second deed of trust are not mine. And Mr. Shea told his friend and colleague, well, what you need to do is pull the escrow file and see what happened. When Mr. Turner did that, he said, hey, whoever did this put in this cashier's check, and the funds came from your HELOC account. You're part of this identity theft. And Mr. Shea said, whoa, no, I didn't do anything like that. You should report it to the sheriffs. Eddie Turner started this investigation by reporting this, what he contended was an identity theft, to the sheriff. When Deputy Derry investigated, Mr. Shea thought he was investigating a potential fraud on Mr. Turner that had occurred, again, six years before, where he had participated in the fraud against Mr. Turner by somehow cycling the money from his HELOC account into this refinancing transaction. Your client knew that Mr. Turner was not correct in saying that somebody had done this without his authorization, right? So when Detective whatever his name is is doing the interview, your client isn't sitting there thinking, oh, my God, maybe Mr. Turner really was the victim of identity fraud. He knew that that was a made-up story, right? No, that's false, Your Honor. At that time, Mr. Shea didn't know what had happened because, frankly, this 2007 refinancing transaction makes no economic sense for anybody. I mean, Mr. Turner paid a bunch of points and fees to replace one loan with another that have virtually identical terms. I mean, that's what happened. Mr. Shea thought at the time in 2007 that because Mr. Turner was unable to get cash out that he had abandoned the refinance. So he thought it never closed at the time. They went ahead and wrapped up their Crestview property, and Mr. Shea received a payment of $51,000, which Well, but does providing $30,000 to close a loan, which is a fraudulent loan, doesn't that provide the basis for under the totality of the circumstances here to find that the warrant was appropriate and adequate? Absolutely not. Absolutely not because the loan didn't have anything to do with the fraud. The fraud was in the application papers that had been submitted months and weeks before. The loan had already been approved, and Countrywide said the source of the funds, which is the fact there was even this loan in the first place is really weird, because normally when somebody refinances a property, they get money back. That's the purpose of doing it. Why Mr. Turner was even putting money in is a question we just can't answer. Mr. Turner denies he did that to this day. But Mr. Turner asked for a loan. He didn't specify the purpose other than for investment and instructed that it be made out in a cashier's check in a certain way. And Mr. Shea gave it to Turner, and then it was paid back timely, 45 days later. And it's all documented, that transaction. That happened after the crime. The crime was the loan application papers that had been submitted and filed weeks or months before. Mr. Burton, your time is just about gone. I want you to address something entirely different. One of the claims you make is that your client's rights were violated because Deputy Derry signed this no-bail affidavit. Yes. Right? Let me finish my question. And so he was held in jail for X number of days before they could hold a bail hearing. Now, it seems to me that that's a claim that comes under the Eighth Amendment's bail clause. But you're not making a claim under the Eighth Amendment, are you? Is that right? You're just making like a substantive due process claim? We raised it as a due process claim. I think it is an Eighth Amendment claim because this. Did you make an Eighth Amendment claim? You know, I'd have to go back and look at the complaint. I just don't want to guess on that. All right. One question. If the panel were to disagree with you on the issue of probable cause, that would take care of the entire cause of action, or does anything survive that ruling? I think, you know, the point that was just raised would survive. The fact that he, without any evidence that Mr. Shea had any feloniously obtained funds whatsoever, filed this affidavit as a matter of county policy. But you have a number of other claims, defamation, et cetera. They all would be under the umbrella of probable cause. You would have to show that first. The defamation plus case claim, yes, would. The pendant state claims would. Okay. And the 1983 claims other than that claim would. That's correct. Okay. But not the Nobel claim. Not the Monel claim because the Monel claim goes to that affidavit that, I mean, there was no basis for Deputy Derry under any view of these facts to think that Mr. Shea had any money six years later. He didn't even get any money out of the transaction in the first place. So to just, as a matter of policy, file these affidavits, which resulted in this, you know, 50-something. But what is the evidence that there was a policy or a practice or a senior government official approved this that would support a Monel claim? That's the testimony of Deputy Derry. We said, why did you do this? He said, because it's a county-wide practice. We always do it. And that's why I did it. I mean, he didn't consider whether the facts that he was alleging had any basis in truth. He said, we just always do it in fraud cases. So that's our evidence on that. Thank you. So I hope I have some time to reserve. We'll give you a couple minutes. Okay. Thank you, Your Honors. Let's hear from counsel for the defendants. May it please the Court. Good morning. My name is Antonio Kizzee. I represent the defendant at Police County of Los Angeles and Detective Christopher Derry. Following up on some of Your Honors' previous questions to my colleague, we are of the opinion that should the probable cause issue be determined against the appellant, all of the claims would thereby fail. But what about the bail claim? Why would that fail? That doesn't depend on probable cause, does it? Regarding the bail claim, and – No, but that does not depend on probable cause, does it? I believe it may depend on probable cause because, on one hand, it was under the California statute that we cited in our answering papers that authorized such a hearing regarding the acquisition of bail funds. Secondly, based on my recollection of the pleading – But that's entirely different from the probable cause determination. It may be, but as far as the Eighth Amendment question that Your Honor posed previously, I have no recollection of there being an Eighth Amendment claim set forth in the – Which also is separate from the probable cause determination. So it doesn't depend on the probable cause determination, does it? The viability of that claim? I respectfully disagree, Your Honor. Well, you haven't convinced me yet. What else can you argue that makes it depend on the probable cause determination? Yes, well, on one hand, if there is a – if there was probable cause, which we contend there is, to arrest Mr. Shea for these financial crimes, based under both the California statute and the authority cited by Deputy District Attorney Mueller, they would have been entitled to have this bail hearing because it dealt with potential feloniously gained monies, which could be applied towards the bail. So that's where I'm of the opinion – Wait a minute. The statute didn't say just because it potentially involved feloniously obtained money, you can, you know, hold the person without bail. You've got to make some showing. I mean, there was no showing on that, was there? Here the showing was where Mr. Shea – The only showing was in Jerry's affidavit that was submitted saying, you know, no bail without a hearing because, you know, he's charged with theft. That's all that's in the affidavit. In the affidavit, yes, and in – Well, what other showing was there on which the no bail determination was made? Yes, another one would be where it is undisputed that Mr. Turner paid back Mr. Shea approximately $50,000. But that was not a fact that was before, you know, that influenced the no bail determination at all. The entire decision not to grant bail was based only upon Jerry's affidavit, right? I do not believe so, Your Honor. Well, what else was there? It was based also on the – Why did he not get bail for two weeks? The reason is because in – Because a no bail affidavit was filed. A no bail affidavit was filed. That's all there was that prevented a bail hearing, right? I believe so. All right. Yes. All right. So it has nothing to do with probable cause, does it? I believe Your Honor has convinced me, potentially. Before you leave that issue, maybe address – as I understand it, this claim is framed just as a Monell claim, and so they need to show – in this instance, they try to rely on a policy to satisfy the requirements of Monell. Why isn't the detective's testimony – he basically says flat out that when questioned, kind of as Judge Shishim has effectively done, there's really no basis in this particular case for your invoking this no bail statute. So why did you do it here? And his response is, I don't know, just standard practice. We do this for every one of these kinds of cases. And that seems to suggest that there was some kind of a countywide policy that would, I guess, require the decision makers to turn a blind eye to the facts of any individual case and just sort of, you know, we're just going to slap this on every case involving whatever this kind of crime was. And why isn't that a potential violation of Mr. Shea's due process rights? Well, on one hand, setting aside that there was no underlying constitutional violation, it's our position because he was arrested with probable cause. On the second hand – No, no, no, no. The violation is not the arrest. It's the holding him without bail. Yes. It's not, you know, not – everybody else, you know, is – where they have downtown a bail schedule, right? Is the testimony of a lower governmental official sufficient to show, and his interpretation of whether or not there is a practice, is that sufficient to show the existence of a practice, or do you need to have either written policy or testimony from a senior official as to what the practice is? And that was going to be my response, that the testimony of a lower deputy, without any further elaboration on it, who does not have the authority to make final policy procedures, nor was there any follow-up as to the basis of his own individual subjective belief as to whether it was a countywide policy. There was no information follow-up on that. So it is our position – In other words, he may be liable individually, but not – on the 1983, but not on their Monell claim for the county. Exactly, Your Honor. As far as the Monell claim for the county, it would be our position that a lower deputy simply stating their belief as to what may or may not be a policy, they have no authority to testify on behalf of the county as a final policymaker or person. And what would be your authority for that? It would, on one hand, be Monell itself. Another one would be some of the cases involving Sheriff Baca, wherein it's often claimed that, oh, a deputy may have taken an action pursuant to some sort of county policy, discoveries conducted. A deputy may say, oh, well, yeah, I took that action because it's my understanding of training. But still, when there's no further elaboration on that by a higher authority, by a person designated on behalf of the county as qualified to testify as to the policy or testify as to ratification of certain actions, that there is some more needed rather than just the testimony of the lowest employee. Well, I guess I mean we're just trying to figure out whether Mr. Shea raised a triable issue of fact, right? And I guess I'm not sure. Why would I'm with you that a lower level deputy can't bind the county in the sense of announcing a policy, right? That then tags the county with liability. But all we're trying to figure out is whether the detective's testimony raises a triable issue of fact as to whether this policy, in fact, was in place. And I guess I don't see why is he disqualified from at least getting past summary judgment. Then, obviously, you all can call in the higher-ups who say that deputy doesn't know what the hell he's talking about. There's no such policy or whatever you would say. But we're just trying to figure out whether he's mustered enough evidence to get past summary judgment. Why isn't the detective's testimony enough? We believe the detective's testimony is not enough because, as Your Honor indicated, he is on the lowest rung. He's not designated by the county to testify regarding binding the county to this is, in fact, a countywide policy. There was no follow-up in the record in Deputy Detective Derry's deposition as to, well, what do you base this on? Have you done this in your other cases? How many other cases have you done this in? There's nothing else. So in terms of when we moved for summary judgment, indicating that there's a lack of evidence to the Minnell claim on those grounds, when the appellant responded with Deputy Derry's testimony, that was the central argument that we made, that, hey, he can't bind the county based on his own subjective belief without further elaboration on that. And going to Your Honor's question earlier, Mr. Shea's statements went beyond mere lack of recollection to actual denial. On the Excerpt 4 EOR 00481, in addition to Mr. Shea on one hand stating, I don't recall getting that cashier's check, he then says, quote, I subpoenaed my documents, and they don't have anything showing that I withdrew that check, which then was directly refuted by Ms. Gasparian's testimony that, yes, here's the check, here's his signature, we've identified him, he asked me to make him the remitter, et cetera. Then you have Mr. Gleeson saying, yes, I recognize Mr. Turner and Mr. Shea, and yes, I recall Mr. Shea assisting Mr. Turner with the 2007 loans, which we believe the appellant concedes were fraudulent and falsified. Well, the application was fraudulent. Yes, yes, the application to secure the loan was based on falsified documents. Now, if the crime is the submission of a false application and the connection of Mr. Shea is that he submitted a check for the closing, which was not, which apparently the bank, contrary to my experience, was not concerned about the source of the funds, how do you connect it up? Are these two separate events? No. I think the general theme as shown in the affidavit is that this is not a separate event. There's several misrepresentations. On one hand, Mr. Turner, in his own declaration in the application, said that these funds are not Bower Road. And then on the other hand, you have Mr. Shea, in a sense, taking it from his HELOC, potentially lying about it to Detective Derry, and then submitting the check with Mr. Turner as the remitter. All of these various aspects, as shown in the warrant affidavit, that Mr. Shea was not arrested on any one fact alone, not based just on the facts to his office and then from his office, not based on these various actions that could be deemed innocent. As Your Honor indicated, probable cause is an objective analysis reviewing the totality of the circumstances. And even under the very deferential standard that we believe applies here that my colleagues' briefs are silent on, when a magistrate issues an arrest warrant based on an affidavit that's also reviewed by Deputy District Attorney Mueller, that the standard is not de novo review. It is whether the magistrate had a substantial basis. No one is contending that there are false facts here. It's really a question of adequacy, which is different from some other cases where the police officer has submitted falsities and you've got a different kind of analysis. This is sort of a weight analysis. Is there sufficient? Yes. So, for example, one authority cited by my colleague is Green Street. In the Green Street case, the court literally said that all they had was this person has a history of drug abuse and they were seeing at this residence, quote, that is all. Here in the warrant affidavit, Mr. Shea, the appellant argues there's not an iota of evidence, lack of indicia. Mr. Shea's name appears 21 times within the 31 pages and our brief lists at least 13 to 14 different instances in the record, which many of these innocent explanations are not, wherein the magistrate, we believe, was not clearly erroneous in reasonably inferring that Mr. Shea may have either committed grand theft or assisted Mr. Turner, his client, friend, repeated real estate business partner, in committing grand theft or having a forged document be filed. What's the chain of inferences that leads to that conclusion, even if we accept that he provided the funds needed to close the loan? Yes. Why does that render? I mean, I'm just thinking, who are the friends I've helped out? Boy, you know, what if they had been involved in some, you know, underlying fraud that I didn't know about, but I, you know, foolishly lent them some money that they then used for this other purpose? Why does, I'm looking at, you know, the part of the report that says, yeah, we went and talked to the bank person and she verifies that, no, no, he came into the bank and purchased that. Okay, so what? Let's say that that occurred. Yes. Why does that render him criminally liable for what this other person did? Well, that renders him, it may not render him criminally liable beyond a reasonable doubt or even beyond a preponderance of the evidence or even a prima facie showing of criminality, but that is not required under the probable cause standard. In terms of the sequence of events, you have Detective Derry conducting this investigation. It's undisputed Mr. Turner committed this fraud. Then you have Mr. Shea on one hand being evasive and giving contradictory, implausible explanations, which under D.C. and Wesby can be ascertained as consciousness of guilt. You have him giving these sort of very far-fetched stories explaining this check and then on one hand denying it. Then you have Mr. Shea, the facts being facts both to and from his office. It's an implausible explanation that, oh, Mr. Turner went out of his way to fax it to and then fax it from, and then further, the counterfeit bank statements indicate that Mr. Turner had approximately $250,000. If Mr. Shea had no reason to believe that they were false, then why on one hand would Mr. Turner need to borrow an additional $30,000 to close these loans? Then you have Mr. Turner indicating, hey, I didn't have any involvement with these loans, which then I know my colleague has made an issue about, well, Mr. Shea said that Mr. Turner had access to his fax machines or his office, but if Mr. Turner denies having any involvement with the loans, then he denies having any involvement faxing the loans from Mr. Shea's office, which then goes to whether an omission may have been material or not. So we believe that as shown in probably the 13 to 14 different facts in the record in the warrant affidavit that we indicate, that there are several quite suspicious chains of events here from which, for qualified immunity purposes, we would refer the court to Ortiz v. Van Auken, 887 F2D 1366-1370, which says, quote, in that case, the officer properly sought to have his belief that there was probable cause reviewed by the Tulare County District Attorney's officer and then by a judge. This is sufficient to establish objectively reasonable behavior, end quote. And this was a qualified immunity analysis here. So on one hand, even if the court is not persuaded, and I'm out of time, but to finish my sentence, if the court is not persuaded that this chain of events leads to a fair probability of criminal culpability, then on the qualified immunity side, we have these facts where Detective Derry did not conduct a warrantless arrest. He sought to have his probable cause belief confirmed by the DA. It was, and I did not come across any case where, under these circumstances, it could be shown that it would be clear to every reasonable officer that they would not have probable cause under the facts of this case. Your Honors, thank you for my time. Thank you. And I'd like to address two points very quickly. First, we actually do contend that the no bail affidavit was individual liability on Deputy Derry's part, that he just lied and said that. His defense, when we asked him about it, he said, well, I didn't lie. I just was given this by the district attorney's office, because in every case in the county, we do this. So the district court analyzed that individual claim against Deputy Derry in detail. I think the only thing I remember in your brief on this issue was that you're challenging the ruling on the Monell liability. Well, we do mention it in the introduction, but in our brief, we do focus on the Monell claim, I think thinking that the two are rolled together. And in retrospect, I wish we would have spelled out the individual claim against Deputy Derry better in our brief. We certainly did in the court below, and the district court addressed it at length in several pages. And the district court denied or granted summary judgment on the Monell claim, not on the ground that there was no tribal issue, which we contend the testimony of Deputy Derry establishes for Rule 56 purposes, but on the ground that there was no constitutional violation. So I think in our thinking... Because there was probable cause. In a sense, because there was probable cause, there's no violation, because you can say that somebody who supposedly committed a fraudulent act or abetted one six years before could have access to funds. I mean, she wrote about that at length, Judge Snyder. So we focus on the Monell claim just to sort of move on, but we definitely believe there was an individual claim there and raised it. So that's number one. And number two, I'd like to turn just very quickly to, again, this loan and just stress, and I think, Judge Watford, your question about, well, so what, and then the response, which was, well, it raised a suspicion, is the problem with the warrant, because we're not talking about whether or not there's a suspicion. A suspicion is one thing. Probable cause to believe that there's a fair probability that Alan Shea committed this crime of defrauding countrywide out of over a million dollars. Probable cause to believe that and to go through this kind of deprivation of liberty and the expense and go to a preliminary hearing where, frankly, what happened at the preliminary hearing is, you know, what do you have that Mr. Shea knew that these representations were? And that they were fraudulent, and he said nothing. That's what happened at the preliminary hearing. That's, that we think is. Now, what is the import? He presents the warrant, and you agree that there is nothing, you're not contesting any of those facts. You're just saying that's insufficient. Well, the one fact that we say is false in the warrant is that he says that Alan Shea and Eddie Turner worked in concert. Well, that's a conclusion of law. That's not a, but my point is, he presents the warrant, as I understand it, the DA approves the warrant, and then the application, and then it's presented to a judge, and the judge, based on those facts, also approves the issuance of the warrant. Now, what's the import of all that? The import of all that is that the standard that we have to meet is that this warrant, when analyzed with respect to Alan Shea, is so lacking in the indicia of probable cause as to make the submission of it. Even though the DA approved it, the judge approved it, would that entitle him to some qualified immunity? It's a reasonable position to take, maybe incorrect, ultimately, but. No, it wouldn't for this reason, because the standard for qualified immunity is the same. It's if no reasonable police officer would have submitted this warrant application. And the reason, then, so it's the same standard, because the way Leon and qualified immunity, all this, I mean, we have a tough burden here. We have to show there's no basis for probable cause, and no one could reasonably believe that. Now, how did it get by a district attorney and a judge? The reason is log rolling. What was done here was 31 pages of reports that detail a crime that was committed by Eddie Turner were submitted, and that clearly there was probable cause to believe a crime had been committed, and that Eddie Turner had committed it. And then Alan Shea was kind of put in as a postscript with this link, and he worked in concert with him. But when you actually look at what the factual basis was for believing there was any concerted action, any knowledge by Alan Shea that these documents had been submitted or that they were false, there is absolutely zero. And this is where the Green Street case came in. It was really mischaracterized. I just happen to know that case pretty well because it was my case where summary judgment had been granted and then was reversed by this court on the ground that when a warrant application is submitted for more than one person or more than one location, probable cause has to exist as to each. And I think in the context of a busy prosecutor, a busy district attorney getting a stack of documents from a detective who is being trustworthy that they've gone through that analysis. And if there's just nothing, and let me just reiterate, there's three zeros here. The first zero is that Alan Shea opened the escrow as a favor for Eddie Turner and Jeff Gleason, the loan broker, because Eddie had said, I want to see if I can refinance my house to get the money to pay you off on our trustee investment. So he did open the escrow. Nothing wrong with that. Number two, the documents that ultimately went into the escrow went through the fax machine at Alan's real estate office where there's all sorts of people, including Eddie Turner, coming and going using the fax machine. Everybody agrees that imputes nothing. The third is this loan. And if I could just, and I know I'm way over time, just sort of the point I never quite got to before is that when Deputy Derry asked Alan Shea about did you make that loan, in Alan Shea's mind it was in the context of Eddie Turner's complaint that somebody had fraudulently put that 2007 loan on his property, had stolen his identity and did it. And Alan Shea knew he had not done that, and therefore he was puzzled by the check. And again, that was six years before a very short-term loan. And he actually went to the bank and tried to say who took this money out of my HELOC account and was told by the bank we can't tell you because the account is closed. And he told Deputy Derry that when Deputy Derry spoke to him. That's what's so suspicious, right? That's the problem, I guess, I have with your position on that front. It is very suspicious. I mean, you're right that I know your client was very active in real estate and the like and was doing all sorts of deals, but the notion that even six years later you wouldn't remember going into a bank to purchase a cashier's check that you personally signed for for a fairly sizable amount of money, that's where I guess I have a problem because he definitely denied ever having done that. No, he did not. He never denied doing it. In fact, if you listen to the recording, which is in the record, if you look at the record, he said he cannot recall. All I looked at was the transcript that you gave. I don't know if it's a complete transcript. And he says in there, I mean, I can pull it out. No, I read it. I know what you're talking about. He said, I don't recall, and if I did it, it was to help Eddie. But I don't recall. Okay, fine. But I'm saying that you wouldn't recall going into a bank. It's not like I wrote a check and I write 10,000 checks a year. You went into a bank to purchase a cashier's check in somebody else's name for $30,000? I don't know. I just think I can see why a detective, when he received the information from your client during the interview, and then the speculation about, oh, well, someone must have taken the money out without my knowledge. That just seemed very suspicious. Because in his mind, the check was being used as part of a fraudulent scheme to place a loan on Eddie Turner's house. It doesn't matter what's in his mind. As Judge Walters said, it's the appearance it gives to the detective. So it doesn't matter what's in his mind. And I understand why that would appear suspicious subjectively to the deputy. And we get that he had a subjective suspicion at that point. And the law is very clear that suspicion is not the same as probable cause. Suspicion would justify him to continue to investigate, get to the bottom of this rather strange sequence, which actually had a pretty simple explanation, which is Allen did not, I'm sorry, Mr. Shea did not take the cashier's check to give to Mr. Turner to close a refinancing transaction. He was not thinking of the transaction with the Crestview property, which six years before had closed at virtually the same time. The cashier's check had the escrow number for the refi on it. It did. So that's what I'm saying. It's not I could see if it was just I wrote a check to my friend as a loan. And that's it had no other connection to this fraudulent transaction. I could see that. But the detective had facts that suggested that, wow, no, maybe this Mr. Shea really was kind of in the middle of it. And the maybe and the suspicion that your honor keeps referring to is precisely our point. Is that that is not the same as probable cause. Yeah, but reasonable inference, though, that that's I think the difference. I don't think so. I don't think you can just go from, you know, a suspicion because there was a a strange sequence of events. Weeks or months after the crime was committed to probable cause to arrest somebody and prosecute them on four felonies, hold them on two hundred thousand dollars bail and, you know, put out a press release of the nature of this one. I mean, this is a man who had never been in handcuffs before. You know, he had a series of professional licenses and never had any action taken against him. He was a member of commissions here in Pasadena. He was a public figure. He had run for public office. You think that the detective should have taken that into account? Well, absolutely. Because you're not dealing with somebody who has a history of identity theft and fraud and criminal behavior. You're dealing with a professional who's got a clear record, you know, into his 50s. High school, college graduate, law school graduate, you know, licensed by the real estate board for years. And that something that is strange and that maybe raises a suspicion that is not the same as having probable cause to arrest. I think the cases are clear. And this was my disagreement with the district court. And I think we've been very upfront about this, you know, in all our pleadings. And today in front of your honors who have been very patient to allow me to go so far over time. And I won't shut up until you tell me to shut up. But I think it's time. It is. But we appreciate we appreciate the difficulty of the case and we appreciate your arguments on both sides. The case just argued is submitted.
judges: Tashima, Watford, Robreno